UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

MAY 1 3 2010

CLERK'S OFFICE-DETROIT-PSG
U.S. DISTRICT COURT

LIVONIA PROPERTY HOLDINGS, L.L.C.,

      Plaintiff,

                              Civil No. 10-11589
                              Hon. John Feikens

      v.

12840-12976 FARMINGTON ROAD
HOLDINGS, L.L.C.,

      Defendant.

---

### OPINION AND ORDER DENYING
### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
### AND DISSOLVING TEMPORARY RESTRAINING ORDER

## I. PROCEDURAL HISTORY

This matter is before the court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. The case was initially filed in the Circuit Court for the County of Wayne, Michigan, Case No. 10-004441-NZ. Judge John H. Gillis Jr. issued a Temporary Restraining Order ("TRO") on April 15, 2010, and scheduled a hearing for April 21, 2010 to determine whether a preliminary injunction should issue. On April 20, 1010, Defendant Lender properly removed the action to this court on diversity grounds. I extended the effect of the TRO to May 14, 2010, scheduled a hearing for May 13, 2010, and requested supplemental briefing on certain questions. The matter has been fully briefed and a hearing was held on May 13, 2010.

## II. MATERIAL FACTS

**A.**     <u>The Original Mortgage And Note To Lehman Brothers</u>

On December 2, 2004, Plaintiff Livonia Properties Holdings, L.L.C. ("Borrower") entered into a $16,300,000 Commercial Mortgage Loan (the "Loan") from Lehman Brothers Bank, FSB ("Lehman Brothers"). The Loan was secured by a Mortgage on four industrial properties in Livonia, Michigan (the "Properties"). The documents executed and delivered by Borrower in connection with the Loan include, but are not limited to, a Promissory Note (the "Note"), Mortgage, and Cash Management Agreement (collectively, the "Loan Documents").

The Loan was disbursed on December 30, 2004, leaving over $5.5 million dollars for Borrower after other disbursements.

**B.**     <u>The Initial Assignment(s) To The Trust</u>

On or about January 6, 2005, effective January 11, 2005, Lehman Brothers executed an assignment of the Loan Documents (the "First Assignment"). Borrower alleges, and Lender appears to concede, that the First Assignment was actually accomplished by way of three interim transfers, occurring over approximately one month:

1.     On or about January 6, 2005, effective January 11, 2005, Lehman Brothers sold the Loan to Lehman Brothers Holdings Inc. ("LBHI");

2.     On or about January 31, 2005,[1] LBHI transferred the Loan to Structured Asset Securities Corporation ("SASC");

---

[1]According to certain representations in a Pooling and Servicing Agreement ("PSA") effective as of January 11, 2005 (executed February 8, 2005), the transfer from LBHI to SASC occurred pursuant to a Mortgage Loan Purchase Agreement dated January 31, 2005. The PSA established the Trust and provided for SASC's deposit of certain Loans thereto.

3.      On or about February 10, 2005,[2] SASC deposited the Loan into the Trust (as defined below).

Ultimately, the Loan Documents were assigned to LaSalle Bank National Association, as Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2005-C1, Commercial Mortgage Pass-Through Certificates, Series 2005-C1 (the "Trust"). The documents executed and delivered by Lehman Brothers in connection with the First Assignment include, but are not limited to, an Allonge, an Assignment/Transfer of (Lien of) Mortgage/Deed to Secure Debt/Beneficial Interest Under Deed of Trust ("First Mortgage Assignment"), and an Assignment of Mortgage Loan Documents (collectively, the "First Assignment Documents").

It does not appear that separate assignments were executed to reflect each interim transfer. Instead, the First Assignment Documents, including the First Mortgage Assignment and the Allonge, list Lehman Brothers as Assignor and the Trust as Assignee. Lender suggests that the assignments were executed "in blank" – apparently contemplating the ultimate assignment to the Trust – and later filled in to identify the Trust as the Assignee.

The First Mortgage Assignment was recorded with the Wayne County Register of Deeds on November 17, 2005.

As discussed more fully below, Borrower argues that the missing interim assignments (reflecting LBHI and SASC as assignees) render the "record chain of title" fatally defective and preclude foreclosure by advertisement by any party.

---

[2]The PSA indicates that the Trust's pass-through certificates were to be issued on February 10, 2005.

### C.    Borrower's Payment History

Beginning in February 2005, Borrower made over $5,000,000 in payments to the Trust, until its default in October, 2009.  During this time, Borrower never questioned the validity of the First Assignment.

### D.    The Prenegotiation Agreement

On December 22, 2009, Borrower entered into a Prenegotiation Agreement with the Trust. In the Agreement Borrower expressly acknowledged that (a) the Trust was the Holder of the Loan Documents; (b) the Loan Documents "are in full force and effect and are binding on the Borrower in accordance with their terms"; (c) "the Loan Documents continue to constitute Borrower's legal and enforceable obligations; and (d) Borrower "currently holds no claim against Holder . . . by virtue of any action(s) or inaction(s) of Holder or any of its predecessors-in-interest, if any."[3]

### E.    The Loan Acceleration

On January 14, 2010, due to Borrower's default, the Trust accelerated the maturity of the Note and invoked the default rate of interest, effective as of October 12, 2009.  As of January 10, 2010, the amount due and owing on the Loan was $17,846,855.93, including principal, interest, prepayment consideration and late charges.

### F.    The Assignment To Defendant Lender

On February 17, 2010, the Trust created the Defendant entity ("Lender").  The Loan Documents were assigned to Lender on or about March 3, 2010 by way of, among other documents,

---

[3]Borrower questions Lender's "poor judgment" in attaching the Agreement, claiming it is confidential for all purposes.  The court reads the Agreement to indicate that the content of any negotiations pursuant to this document are confidential, but Borrower cannot avoid the waivers and admissions made within the document itself.

a Second Allonge, an Assignment of Mortgage, a General Assignment, and an Assignment of Claims (collectively, the "Second Assignment Documents").

The Assignment of Mortgage (the "Second Mortgage Assignment"), listing the Trust as Assignor and Lender as Assignee, was recorded with the Register of Deeds on March 4, 2010.

Before the hearing on this matter, Lender produced the <u>originals</u> of the Loan Documents, the First Assignment Documents, and the Second Assignment Documents.

## G.      The Cash Management Agreement

Under the terms of the Cash Management Agreement, Borrower pledged substantial cash reserves to be held so long as a certain judgment remained unpaid. The agreement was to terminate upon notice to Lender that the judgment was deemed satisfied by a court of competent jurisdiction.

On March 1, 2010, a judge ordered that the judgment was satisfied. On March 4, 2010, Borrower provided notice of satisfaction to Lehman Brothers "and counsel for [Lender]"[4] and requested that the remaining cash reserves be immediately released to Borrower.

Borrower claims that "in excess of $400,000" has been wrongfully withheld. Borrower also contends that, if the funds had been released, it "could have paid those monies toward the debt obligation on the Promissory Note, so that the Note would not be in alleged default, thereby not causing any alleged default on the Mortgage." According to Borrower, then, Lender would have no right to foreclose the Mortgage, by advertisement or judicial process.

Lender notes that, upon an event of default of the Mortgage (which occurred in October 2009), "Lender may apply the Collateral to the payment of the Debt in any order in its sole discretion

---

[4]Again, this suggests that Borrower recognized Lender's status as assignee and holder of the Loan Documents.

or for such other purposes as may be authorized under the Loan Documents." Lender argues that because Borrower defaulted seven months before the judgment was satisfied, Lender was within its rights to apply the funds "in any order in its sole discretion."

## H.    The Foreclosure

As required by the applicable statutes, on March 24, March 31, April 7, and April 14, 2010, Lender published notices that the Properties would be foreclosed by public auction on April 22, 2010. A notice of foreclosure was also posted on each of the Properties. Borrower makes no allegations of any defect in the notice procedure.

On April 12, 2010, Borrower's counsel notified Lender's counsel that it was challenging certain aspects of Lender's right to foreclose and requesting that Lender "cease and desist from all efforts attempting to sell or convey the properties, by advertisement or otherwise." Borrower's challenges include:

1.    The Assignment from Lehman Brothers to the Trust is invalid because:
    a.    there is no assignee on the face of the document[5];
    b.    the person who executed the Assignment for Lehman Brothers lacked present intent to convey the documents to the Trust because the ink stamp defining the assignee was likely affixed after the assignment was executed;[6]
    c.    the assignor also lacked present intent to convey the documents because Exhibit A to the assignment identifies the original mortgage recording date as January 24, 2005, eighteen days after the assignment was executed (on January 6, 2005).

---

[5]The space for the Assignee contains an asterisk, and at the bottom of the page, below the statement [Remainder of Page Intentionally Left Blank], the asterisk is used to define the assignee as the Trust.

[6]Borrower also alleges that whomever affixed the ink stamp defining the Trust as the assignee may have lacked authority to do so.

2. The Assignment from the Trust to Lender is invalid because:

    a. Borrower has no indication that the person executing this assignment had property authority to do so.

3. The Assignment to Lender references only an assignment of the Mortgage, not the Note. Borrower demanded evidence that the Note was also assigned, and physically transferred, to Lender.

Borrower also demanded evidence that the Cash Management Agreement was assigned to Lender, an accounting history regarding the loan, and a copy of the loan application.

On April 13, 2010, Lender responded by disputing Borrower's "validity" arguments. It also offered to make "the original Note, Mortgage, Assignment of Rents, and the necessary assignments" available at the office of Lender's counsel for "the limited purpose of confirming the documents contain the appropriate original signatures." Rather than take Lender up on its offer, Plaintiff filed the instant action.

Borrower now questions the validity of the First and Second Mortgage Assignments in this proceeding. As noted above, in addition to the challenges raised in Borrower's April 12, 2010 letter, Borrower claims that the failure to record interim assignments reflecting LBHI and SASC as assignees renders the record chain of title fatally defective. Borrower states that Lender has no right to foreclosure by advertisement, and such foreclosure should be enjoined.

### III. ANALYSIS

#### A.   <u>Standard For Granting An Injunction</u>

The Supreme Court has stated that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, ___ U.S. ___, 129 S.Ct. 365, 376 (2008). *See also Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the

movant carries his or her burden of proving that the circumstances clearly demand it."); *Roghan v. Block*, 590 F. Supp. 150, 153 (W.D. Mich. 1984), *aff'd* 790 F.2d 540 (6th Cir. 1986) ("There is no power the exercise of which requires greater caution, deliberation, and sound discretion, or more dangers in a doubtful case, than the issuance of an injunction.") (citation omitted). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Thus, Borrower here must affirmatively demonstrate its entitlement to injunctive relief.

A plaintiff seeking a preliminary injunction must establish (1) that he has a strong likelihood to succeed on the merits; (2) that he is likely to suffer irreparable harm without the injunction; (3) that the injunction would not cause substantial harm to others; and (4) that an injunction is in the public interest. *Winter,* 129 S.Ct. at 374; *ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003). Although the factors are to be balanced, a finding that there is no likelihood of irreparable harm, *Winter*, 129 S.Ct. at 375, or no likelihood for success on the merits, *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000), is usually fatal.

**B.     <u>Likelihood Of Success</u>**

To establish a likelihood of success, a plaintiff must, "at a minimum, show[ ] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997) (quotation and citation omitted).

In Michigan, the right to foreclosure by advertisement is statutory. Such foreclosures, however, "are a matter of contract, authorized by the mortgagor, and ought not be hampered by an

unreasonably strict construction of the law." *Church & Church, Inc. v. A-1 Carpentry*, 766 N.W.2d 30, 36 (Mich. App. 2008).

Borrower has raised a claim for declaratory relief with regard to Lender's standing and authority to foreclose by advertisement under M.C.L. § 600.3204. Essentially, Borrower asserts four "defects" to Lender's right to foreclose by advertisement: (1) Lender has not provided evidence that it physically possesses the Note; (2) technical defects in the First and Second Mortgage Assignments render them invalid; (3) because two alleged assignments of the Mortgage (to LBHI and SASC) are not recorded with the Register of Deeds, Lender cannot establish the requisite record chain of title; and (4) Lender allegedly breached the Cash Management Agreement by failing to release certain funds to Borrower, without which breach, Borrower claims it would not be in default or subject to foreclosure. Borrower also asserts trespass to chattels and conversion claims based on the same alleged defects.

Because Borrower's trespass to chattels and conversion claims rely on similar analysis, I will begin with a review of Borrower's claim for declaratory relief.

### 1. *Borrower Has Not Established A Likelihood Of Success On The Declaratory Action Claim*

Michigan's foreclosure-by-advertisement statute permits a party to foreclose by advertisement if (in relevant part):

> (1) . . . (a) A default in the condition of the mortgage has occurred, by which the power to sell became operative;
>
> (d) The party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage; and
>
> (3) If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title shall exist prior to the date of sale . . . evidencing the assignment of the mortgage to the party foreclosing the mortgage.

M.C.L. § 600.3204(1) and (3).

### a. *Borrower Does Not Dispute That It Is In Default*

Lender alleges that Borrower has failed to make payments on the Loan from October 11, 2009 to the present. Lender accelerated the maturity of the Note and demanded payment in full by Demand Letter dated January 14, 2010. According to Lender, the amount due and owing on the Loan as of April 15, 2010 was $18,112,138.80, representing the accelerated principal, interest, prepayment consideration, late charges, and fees.

Because Borrower has offered no evidence to dispute these facts, Lender has satisfied condition (1)(a).

### b. *Lender Offers Sufficient Proof That It Is The Owner Of The Indebtedness*

Borrower argues that Lender cannot satisfy condition (1)(d) – that it owns the indebtedness or an interest in the indebtedness – because it has not provided proof that it is in physical possession of the original Note. Borrower cites *Davenport v. HSBC Bank USA*, 739 N.W.2d 383 (Mich. App. 2007), claiming that Lender's failure to provide such evidence "is a structural defect that goes to the very heart of defendant's ability to foreclose by advertisement." That case is distinguishable. In *Davenport*, the foreclosing bank published the notice of foreclosure *before* it was assigned any rights in the mortgage. The court explained that, where the defendant did not own an interest in the mortgage when it commenced foreclosure proceedings, those proceedings were void. In the instant case, the Second Mortgage Assignment to Lender was recorded with the Register of Deeds on March 4, 2010, and the notice of foreclosure was first published on March 24, 2010. Thus, *Davenport* is inapposite to the issues in this case.

Nevertheless, I agree with Borrower's basic premise that before Lender can initiate foreclosure proceedings, it must establish that it owns the indebtedness.

Lender has offered testimony by affidavit of David H. Smith[7] that Lender is currently the holder of the Note, Mortgage, and all other Loan Documents, and the First Assignment Documents and Second Assignment Documents. Smith also stated that the Loan Documents, First Assignment Documents, and Second Assignment Documents are true and authentic copies of the original respective documents. Finally, Lender produced the original of each relevant document before the hearing on May 13, 2010. The Court has examined those documents and compared them to copies of the same that each party attached to its court filings.[8] In addition, the Court compared each recorded document with the corresponding copy that Plaintiff independently obtained from the county recorder. The Court's review demonstrates that Defendant is in possession of the authentic original documents. The originals bear original signatures in a variety of inks, original recording stamps (and in some cases, original receipts from the recording), affixed stickers identifying the Trust as the assignee, raised notary seals, and all "imperfections" – such as cross-outs and stray marks – that were visible on the copies. The Court has no reason to question the authenticity of the documents and is satisfied that they appear authentic on their face. Accordingly, Defendant has established that it is the holder of the indebtedness.[9]

---

[7]David H. Smith is a Senior Vice President for CWCapital Asset Management LLC ("CWCapital"). CWCapital is the Special Servicer for the Trustee of the Trust. The Trust is the sole member of Lender.

[8]Plaintiff has raised no authenticity-based objections to the previously-available copies, instead challenging only whether Defendant was in physical possession of the originals.

[9]Borrower argued that, if Lender could not establish its physical possession of the Note, "the party that took *actual* assignment of the Note could still sue [Borrower] for the entire debt." (Motion

Arguing in the alternative, Borrower cites numerous cases for what it purports to be the "majority rule" that "if there is sufficient space on a note for endorsement, one does not become a holder in due course if the purported assignment or transfer is pursuant to an allonge."

As Borrower acknowledges, endorsement of a negotiable instrument is governed by M.C.L. § 440.3204. A 1993 amendment to that section added the sentence, "For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is part of the instrument." M.C.L. § 440.3204(1). The commentary to that section explains, "[a]n indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement."

Thus, regardless of any purported majority rule, an Allonge affixed to a Note effectively negotiates the instrument without regard to space remaining on the original instrument.

Finally, Borrower argues that the allonges were ineffective because they were not "affixed" to the Note. Under Michigan law, an allonge "affixed" to a note becomes "part of the instrument." M.C.L. § 440.3204(1).[10] Borrower cites two non-binding state court decisions from other jurisdictions in support of its argument. The Court's independent research identifies no Michigan or Sixth Circuit authority establishing the method of attachment necessary to create an effective endorsement.

---

at 8-10). Because Lender has established its possession, Borrower is no longer at risk of any action for double-recovery by a non-holder. M.C.L. § 440.3602 (providing that any payment to a 'person entitled to enforce the instrument' must be credited against the note).

[10]The previous version of this rule, then in M.C.L. § 440.3202, required an allonge to be "so firmly affixed [to the Note] as to become a part thereof." A 1993 amendment rewrote this section, which now requires only that the allonge be "affixed." The change in language suggests an intent to expand, rather than restrict, the use of allonges. *Cf. Estrada v. River Oaks Bank & Trust Co.*, 550 S.W.2d 719, 728 (Tex. App. 1977) (finding the reverse change – from "attached" to "so firmly affixed . . . as to become a part thereof" – evidenced a clear intent to restrict, rather than expand, the use of allonges.).

In this case, the allonges presented to the Court were attached to the Note; the First Allonge

states that it "forms a part of that Promissory Note dated December 30, 2004 made by" Borrower to

Lehman Brothers; and the Second Allonge states that it is "to be attached to, modify, and be a part

of that certain Promissory Note . . . dated effective December 30, 2004, made by [Borrower] payable

to the order of [Lehman Brothers]." In these circumstances, given the clear intent that the Note and

Allonges were to be physically attached, the evidence is insufficient to invalidate the endorsements.

*See In re Nash*, 49 B.R. 254, 261 (Bankr. D. Ariz. 1985).

> c.     *Lender Has Established A Record Chain Of Title*

Borrower next argues that Lender cannot satisfy condition (3) because it "has not produced

evidence of an unbroken chain of assignments of the Mortgage, beginning with Lehman Brothers

and ending with [Lender]." Although Borrower's search of the Register of Deeds revealed

assignments from Lehman Brothers to the Trust, and from the Trust to Lender, Borrower alleges that

two interim assignments have not been recorded, precluding Lender from satisfying M.C.L. §

440.3204(3). Borrower also challenges the validity of the recorded assignments based on certain

technical defects.

> (1)     *The Unrecorded Assignments Do Not Prevent Lender From
> Foreclosing By Advertisement*

Borrower asserts that two interim assignments exist, neither of which were recorded with the

Register of Deeds. Citing *Arnold v. DMR Financial Services*, 532 N.W.2d 852, 855-56 and n. 7

(Mich. 1995), Borrower claims that the absence of these assignments in the county record prohibits

foreclosure by advertisement. Notably, however, *Arnold* holds that a mortgagee's failure to record

an assignment to a third party as security did not render foreclosure by advertisement void:

In *Feldman* [*v. Equitable Trust Co.*, 270 N.W. 809, 810-11 (Mich. 1937)], this Court held, and we hold again that [the foreclosure by advertisement statute] provided that only the record holder of the mortgage could foreclose by advertisement, and the mortgagor was not affected by the fact that others had an unrecorded interest in the mortgage. . . . **[T]he existence of equitable rights in the mortgage by persons other than the person who had legal title alone did not create a valid objection on behalf of the mortgagor if the mortgagor was unaffected by those interests.**

*Id.* at 676-78 (emphasis added).

Although Borrower argues that the holding of *Arnold* is limited to unrecorded assignments for security purposes only, the Michigan Supreme Court addressed unrecorded assignments for the purpose of establishing a trust in *Peterson v. Jacobs,* 6 N.W.2d 533 (Mich. 1942). In *Peterson*, an interim holder held an assignment of a loan for eight months before depositing it into a trust. The assignment to that interim entity was never recorded. The court stated that "**[i]t would have been perfectly useless and serve no good purpose to mention the assignment and reassignment unless such legal formalism is mandatory.**" *Id.* at 536. It then upheld the foreclosure sale, explaining that the statutory requirements need only substantial compliance. "Slight and inconsequential irregularities" – including the failure to record the short-term interim assignment – did not invalidate the foreclosure by advertisement. *Id.*

In this case, the allegedly missing assignments were held by two entities for a combined total of <u>one month</u> (on or about January 6, 2005, to February 8, 2005), far less than the period at issue in *Peterson*. Borrower has not been affected by any failure to record assignments to those entities. Lender has established a record chain of title from the original mortgagor (Lehman Brothers) to Lender. The chain of title, which substantially complies with the foreclosure by advertisement statute, establishes Lender as the only entity with a right to foreclose by advertisement.

Borrower disputes the validity of the assignment documents on several grounds outlined above. But, as a non-party to those documents, it lacks standing to attack them.

Apart from the minimum constitutional requirements for standing, the Supreme Court recognizes other "prudential limitations" on the question of standing. *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). Among these limitations, a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.*

Lender argues that under principals of basic contract law, a non-party to a contract does not have the right to challenge the validity of the contract unless it is a third-party beneficiary to that contract. Borrower counters, without authority, that although as a non-party it cannot *enforce* a contract, Borrower only seeks to "prevent a sale of property" through "examination of the validity of the assignments." (Pl. Reply, Dkt. 20 at 5). Effectively, Borrower seeks to *prevent enforcement* of the assignments – despite the fact that the parties have affirmed their validity.[11]

Borrower certainly has an interest in avoiding foreclosure. But the validity of the assignments does not effect *whether* Borrower owes its obligations, but only *to whom* Borrower is obligated. Although a debtor may assert certain defenses that render an assignment absolutely invalid (such as nonassignability of the right assigned), he generally may not assert any ground which may render the assignment voidable "because the only interest or right which an obligor of a claim has in the instrument of assignment is to insure him or herself that he or she will not have to pay the

---

[11]By way of affidavit, William Walenczyk, Senior Vice President of Aurora Bank FSB f/k/a Lehman Brothers expressly affirmed the validity of the transfer to the Trust. And David H. Smith, Senior Vice President of CWCapital, the Special Servicer for the Trust, affirmed the validity of the transfer from the Trust to Lender.

same claim twice."[12]  6A C.J.S. ASSIGNMENTS § 132.  A debtor, for example, cannot raise alleged

acts of fraud, or question the motive or purpose underlying an assignment.  *Id.*

In *Pashak v. Interstate Highway Construction, Inc.*, No. 189886, 1998 WL 2001203 (Mich.

App. Mar. 20, 1998), the Michigan Court of Appeals held that a lessee lacked standing to challenge

the validity of the lessor's assignment of its interest in the lease:

> Although [lessee] challenges the validity of the assignment [of the lease] as
> between [the assignor] and [the assignees], we find that it lacks standing to do so
> where the parties to the assignment . . . do not contest its validity.

*Id.* at *1 (citing *Woods v. Ayres*, 39 Mich. 345 (1878) (holding that where the parties to an

assignment act in accordance with the assignment, and there is no evidence that either party to the

assignment objects so as to create a hostile title, a third-party to the assignment cannot challenge its

validity)).

And in *Bowles v. Oakman*, 225 N.W. 613 (Mich. 1929), the Michigan Supreme Court held

that a maker of a note may not attack the validity of a transfer of that note:

> The fraud of [the assignee] did not render the transfer void.  It was at most voidable
> at the instance of those defrauded.  Plaintiff was the holder of the note, and had title
> to it at the time of trial. . . .

> [Debtor] had no defense of his own to the note.  He [may not defend on the grounds
> that] an indorsee had been guilty of fraud upon the payee or the equitable owners.
> An adjudication upon such defense would not bind the persons defrauded, as they are
> not parties hereto, and it would be idle.  This action is by the person having legal title
> to the note.  A judgment herein is conclusive.  It makes no difference to [the payor]
> who may have equitable title to the note, as he has no defense on the merits.

*Id.* at 614.   The court also quoted *Gamel v. Hynds*, 125 P. 1115 (Okla. 1912), with approval:

---

[12]As noted above, because Lender has established that it holds the original Note, Borrower
is not at risk of paying the same claim twice.

16

> The assignor or indorser on negotiable instruments must protect his own interest, where he had been induced to assign or indorse through fraud; and **the maker cannot defend or set up matters of defense which only exist between the indorser and indorsee.**
>
> **The maker of a promissory note cannot, in an action brought against him by the indorsee or transferee thereof, litigate questions that can properly arise only between the holder and his immediate indorser.**

*Id.* (emphasis added).

Michigan's Commercial Code also recognizes that, except in limited circumstances not applicable here, an obligor of a negotiable instrument may not assert the defenses of another, including the assignor of the instrument. M.C.L. 440.3305(3) ("the obligor may not assert against the person entitled to enforce the instrument a defense . . . of another person").

In fact, for over a century, state and federal courts around the country have applied similar reasoning to hold that a litigant who is not a party to an assignment lacks standing to challenge that assignment. For example, in *Ifert v. Miller*, 138 B.R. 159 (Bankr. E.D. Pa. 1992), the court explained that an obligor lacks standing to challenge an assignment:

> [The underlying contract] is between [Obligor] and [Assignor]. [Assignor's] assignment contract is between [Assignor] and [Assignee]. The two contracts are completely separate from one another. As a result of the assignment contract, [Obligor's] rights and duties under the [underlying] contract remain the same: The only change is *to whom* those duties are owed. . . . [Obligor] was not a party to [the assignment], nor has an cognizable interest in it. Therefore, [Obligor] has no right to step into [Assignor's] shoes to raise [its] contract rights against [Assignee]. [Obligor] has no more right than a complete stranger to raise [Assignor's] rights under the assignment contract.

*Id.* at 166 n. 13 (applying Texas law). The same analysis applies here. The Loan Documents are between Borrower and Lehman Brothers. The assignments are between (some combination of) Lehman Brothers, LBHI, SASC, the Trust, and Lender. After the assignments, Borrower's rights and duties under the Loan Documents remain the same, the only change being *to whom* those duties

are owed. Borrower cannot now step into the shoes of an assignor to assert its contract rights. *See also Liu v. T & H Mach., Inc.*, 191 F.3d 790 (7th Cir. 1999) (party to underlying contract lacks standing to "attack any problems with the reassignment" of that contract); *Blackford v. Westchester Fire Ins. Co.*, 101 F. 90 (8th Cir. 1900) ("As long as no creditor of the assignor questions the validity of the assignment, a debtor of the assignor cannot do so."); *Byczek v. Boelter Cos.*, 230 F. Supp. 2d 843 (N.D. Ill. 2002) (same); *Nicolls Pointing Coulson, Ltd. v. Transp. Underwriters of La., Inc.*, 777 F. Supp. 493 (E.D. La. 1991) ("a debtor cannot challenge an assignment of a debt by a creditor unless he can show he is prejudiced by the assignment"); *The Prussia*, 100 F. 484 (D. Wash. 1900) (holding the validity of an assignment cannot be collaterally attacked on the ground of alleged technical irregularities by a non-party to the assignment, where no objection is made by the assigning entity); *In re Holden,* 2 N.E.2d 631 (N.Y. 1936) ("The assignments were valid upon their face. The assignee was the legal owner of the claims assigned. No one could question the validity of the assignments except the assignors."); *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith P'ship*, No. 08-07-00090, ___ S.W. 3d ____, 2010 WL 450910 (Tex. App. Feb. 10, 2010) (finding lessor lacked standing to challenge assignment of lessee's breach of lease action because lessor was not party or third-party beneficiary to assignment contract); RICHARD A. LORD, 29 WILLISTON ON CONTRACTS § 74:50 (4th Ed.) ("**the debtor has no legal defense [based on invalidity of the assignment] . . . for it cannot be assumed that the assignee is desirous of avoiding the assignment.**") (emphasis added).

In light of these compelling authorities, I hold that Borrower may not challenge the validity of assignments to which it was not a party or third-party beneficiary, where it has not been prejudiced, and the parties to the assignments do not dispute (and in fact affirm) their validity.

I offer a brief discussion of Borrower's likelihood of success on the merits, should Borrower have been permitted to challenge the validity of the assignments. First, Lender submits that Borrower made over $5,000,000 in payments to the Trust without questioning whether it was paying to the appropriate entity. It was only *after* Borrower defaulted, and a foreclosure sale was imminent, that Borrower raised supposed irregularities in the Assignments. And as recently as December 22, 2009, Borrower expressly acknowledged that "the Loan Documents are in full force and effect and are binding on [Borrower] in accordance with their terms", "the Loan Documents continue to constitute [Borrower's] legal and enforceable obligations", and "[Borrower] . . . currently holds no claim against Holder." Therefore, even if Borrower was permitted to challenge the validity of the assignments, Lender would appear to have valid defenses of laches, estoppel, waiver, and/or ratification sufficient to rebut Borrower's challenges at this stage in the proceedings.

Next, Borrower argues that the Trust was not created at the time the Assignment to it was executed and thus the assignment should be declared void. Lender explains that the Pooling and Service Agreement, which established the Trust, is dated "as of January 11, 2005" – the effective date of the Assignment to the Trust. Even if the Trust was created later, as Borrower suggests, Lender would appear to have valid counter arguments that the assignments are valid under the *de-facto*-corporation or corporation-by-estoppel doctrines, or that the parties to the Assignments ratified or adopted the contract(s) after the Trust was formed. *See, e.g., Duray Dev., LLC v. Perrin,* ___ N.W.2d ___, 2010 WL 1461616 (Mich. App. 2010). Ratification or adoption, including by complete

performance by the parties, also would appear to "cure" any alleged defects caused by persons executing the contracts without proper authority.[13]

Finally, to the extent Borrower argues that Lehman Brothers' failure to identify an assignee at the time it executed the assignment defeats the requisite "present intent" to make a transfer, the law permits assignment in blank, which authorizes the transferee/holder to fill in the blanks with terms consistent with the parties' intent. *See, e.g.*, *McCurdy v. Van Os,* 287 N.W. 890 (Mich. 1939) (holding assignment in blank sufficient to release assignor, where bank (purported assignee) took possession of assignment and related original documents and exercised control over property consistent with having released assignor from obligations); *Mason Lumber Co. v. Collier*, 41 N.W. 913 (Mich. 1889) ("an assignment, like the one in question here, if filled in with the name of an assignee, after deliver[y] in blank, with the consent of the assignor, would become operative and valid in the party whose name was thus inserted."); M.C.L. § 440.3115 (an incomplete instrument may be completed according to its terms, as augmented with authority of the signer; **the burden of establishing that additions are without authority is on the person asserting the lack of authority**). That all parties to the assignments acted as though they were valid – including physically transferring the original documents to each successor assignee – would appear to defeat

---

[13]Without citing authority, Borrower claims that David H. Smith lacked authority to execute the Second Mortgage Assignment from the Trust to Lender. For this proposition, Borrower relies exclusively on the absence of Smith's name from CWCapital's Certificate of Organization. Under Massachusetts Law, a recordable instrument affecting an interest in real property executed in the name of a limited liability company by any person identified on the Certificate of Organization "shall be binding on the limited liability company." M.G.L. 156C § 66. Although this conclusively establishes the authority of any person named on the Certificate to execute real-property instruments, it does not establish that a person *not named* on that Certificate lacks authority. This would seem to be especially true when the executed instrument does not affect *CWCapital's interest* in real property, but rather an interest of an entity for which CWCapital serves as Special Servicer, as in the instant matter.

Borrower's intent-based arguments without the need to reconstruct history or conduct extensive discovery against non-parties to this action.

### 2. *Borrower Has Not Established A Likelihood Of Success On Its Remaining Claims*

#### a. *Trespass To Chattels And Conversion*

"A trespass to chattels is actionable if one dispossesses another of or intentionally and harmfully interferes with another's property." *Mackie v. Bollore S.A.*, No. 286461, 2010 WL 673295 (Mich. App. Feb. 25, 2010).

Conversion is generally defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600 (Mich. 1992).

In its Complaint, Borrower argues that Lender's allegedly wrongful efforts to foreclose form the basis for these claims by "interfer[ence] with " and "exertion of wrongful dominion over" Borrower's "Properties." Borrower has cited no authority to suggest that a foreclosure of <u>real property</u>, even if wrongful, can satisfy these <u>personal-property-based</u> claims. Nevertheless, because Borrower has not shown substantial likelihood of success on is declaratory judgment action based on the same allegations, it cannot show a likelihood of success on these claims.

#### b. *Breach Of Contract*

Borrower alleges that Lender breached the Cash Management Agreement by failing to release certain funds, in violation of Paragraph 12 of that agreement (describing certain termination events). Borrower claims it provided the proof required to terminate the agreement and release the funds on March 4, 2010, but Lender has refused to tender or otherwise account for the funds. Borrower further alleges that it "could have paid those monies toward the debt obligation . . . so that the Note

would not be in alleged default, thereby not causing any alleged default on the Mortgage . . . [leaving Lender] no right to foreclose the Mortgage."

Lender notes that Paragraph 9 of the Cash Management Agreement permits the Lender to "apply the Collateral to the payment of the Debt in any order in its sole discretion" if an Event of Default occurs. Because Borrower defaulted on the loan in October 2009, and the debt was accelerated in January 2010, Lender argues that Borrower was the first to breach and cannot maintain an action against based on Lender's alleged subsequent breach or failure to perform. *See Flamm v. Scherer*, 198 N.W.2d 702 (Mich. App. 1972).

Borrower does not dispute this, and appears to concede that by the time Lender allegedly breached the Cash Management Agreement, the debt had been accelerated due to Borrower's prior default. The balance due and owing as of January 14, 2010, was over $17,000,000. Even if Lender had released the funds, Borrower would have been unable to cure its default.

Accordingly, Borrower has not shown a likelihood of success on the merits on this claim.[14]

## C.    **Likelihood Of Irreparable Harm**

With respect to the this factor, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. As the Supreme Court has noted,

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted).

---

[14]Even if Borrower could succeed on this breach of contract claim, it could not show irreparable harm because money damages would be a sufficient remedy. *See Basicomputer Corp, infra.*

In evaluating the harm facing the plaintiffs, the court must evaluate three factors: "(1) the substantiality of the injury alleged, (2) the likelihood of its occurrence, and (3) the adequacy of the proof provided." *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). In establishing the harm, a movant must provide record evidence, such as facts and affidavits, from which the court can make specific findings. *Id.* at 290-91. "[A] plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

Borrower submits, without supporting evidence or authority, that "the value of losing its real property (along with established tenants who have leases), the significant tax consequences to [Borrower] if there were a sale, and the loss of goodwill is hard to calculate and cannot be compensated alone with money damages." (Dkt. 15 at 19). Borrower also states without authority that:

> the power to redeem will not return [Borrower] to the status quo, because the tax consequences of the sale cannot be undone; nor can one say with any certainty that [Borrower] will be able to retain its tenants with the specter of a transfer of the property to the new owners looming; nor can one say that [Borrower] will be able to recover its goodwill with the black eye of foreclosure looming . . . . Moreover, the financing terms of the loan which allow payment over time at a desirably low interest rate (the Note does not mature until January 2015) will have been lost.

*(Id.* at 20).

Lender argues that Borrower "has been damaged by its own default in failing to make payments as required by the Loan Documents since October 2009, not by any loss caused by Lender's pending foreclosure." Moreover, Lender submits that Michigan's six-month statutory redemption period is an adequate remedy at law sufficient to deny injunctive relief. (Dkt. 16 at 7)

(citing *Dumas v. Helm*, 166 N.W.2d 306, 309 (Mich. App. 1968) ("The rights of redemption provided for in foreclosure matters provide defendants with adequate relief")).

It appears that many of Borrower's alleged harms are self-inflicted or speculative – neither of which satisfy the irreparable harm requirement. *See* 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE CIV. § 2948.1 (2d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."; "Speculative injury is not sufficient."). With the debt having been accelerated due to Borrower's admitted default, Borrower already has lost its "desirably low interest rate." Similarly, the "black eye of foreclosure" is looming because of Borrower's default, not Lender's actions or any allegedly defective assignment. And Borrower has provided no evidence of a likelihood of loss of goodwill sufficient to justify an injunction.

Finally, because Borrower is permitted to redeem after the sale, it has not shown that irreparable harm will occur at the time of the foreclosure sale. *Sayo v. Zions First Nat'l Bank*, No. 06-14963, 2006 WL 3392072 (E.D. Mich. Nov. 22, 2006) (rejecting loss-of-goodwill arguments, finding redemption period adequate remedy, and denying motion to enjoin foreclosure); *see also Dumas, supra.*

D.     **Harm To Others And Public Interest**

Lender alleges that the present delay in the foreclosure harms it in the amount of $3,595 in lost interest each day, plus legal expenses and attorneys' fees.

In terms of public policy, as Judge Hood explained in *Sayo, supra*:

> there are public policy arguments in favor of both sides of the dispute. Public policy disfavors the sale of real property through foreclosure auctions, but also favors parties to honor contractual agreements, such as the Mortgage Agreement in this case.

## E.  Balancing The Factors

The critical first and second factors weigh in favor of Lender.  Borrower cannot demonstrate that it will succeed on the merits or suffer irreparable harm caused by the failure to issue an injunction.  As to the third factor, Borrower has not shown that its harms decidedly outweigh Lender's harms.  And, because Borrower contractually agreed to the foreclosure-by-advertisement remedy, public policy does not favor permitting Borrower to escape its contractual obligations, especially where it cannot satisfy the other factors.

The court will not issue a preliminary injunction to prevent Lender from foreclosing by advertisement.

## IV.  CONCLUSION

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 1, Attachment #3) is DENIED with prejudice; and

Wayne County Circuit Court's April 15, 2010 Temporary Restraining Order, extended by Order Extending Effect of Temporary Restraining Order (Dkt. 14) is DISSOLVED.

**IT IS SO ORDERED.**

Date:  ___May 13, 2010_____      _s/ John Feikens_____
                                             John Feikens
                                             United States District Judge

| Proof of Service |
| --- |
| I hereby certify that the foregoing order was served on the attorneys/parties of record on May 13, 2010, by U.S. first class mail or electronic means. |
| _s/Carol Cohron_____ |
| Case Manager |